# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| **CHRISTA MYRICK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NO.:** |
| ) | |
| vs. ) | |
| ) | **JURY TRIAL DEMANDED** |
| **NAVY FEDERAL FINANCIAL GROUP, LLC,** ) | |
| **d/b/a NAVY FEDERAL CREDIT UNION** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## COMPLAINT

Plaintiff sues Defendant and states as follows:

1. This is a suit to obtain relief for violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2614, et seq.

2. The Court's powers are invoked pursuant to 28 U.S.C. §§ 1331, 1343(4) and 28 U.S.C. §§ 2201 and 2202.

3. The unlawful employment practices and acts of discrimination about which plaintiff complains were committed within this division of the Northern District of Florida.

### Parties

4. The plaintiff, Christa Myrick ("Myrick"), is over 18 years of age and is a resident of Escambia County, Florida.

5. The defendant, Navy Federal Financial Group, LLC, ("Navy Federal" or "defendant") is a foreign corporation doing business in the Northern District of Florida.

6. Myrick was an employee of the Navy Federal at all material times.

7. Myrick was an employee who was paid on a salary basis.

8. At all times relevant to this suit, Navy Federal was an employer for purposes of the Family and Medical Leave Act.

9. Navy Federal is a financial institution employing hundreds of workers nationwide.

10. Navy Federal maintains operations in Escambia County, Florida.

## Conditions Precedent

11. Plaintiff brings this action within two years of the conduct asserted to be in violation of the FMLA, as detailed below.

12. This action is timely filed.

## Factual Allegations

13. Myrick was hired in 2006 by the defendant.

14. At the time of her termination, Myrick was a manager within the CCO Multimedia branch.

15. In the first year of employment, Myrick received two merit increases in her pay.

16. In 2007, Myrick was promoted and received another merit increase in pay.

17. In 2008, Myrick received a five percent merit increase in pay.

18. In 2008, Myrick's performance evaluation showed she had exceeded expectations.

19. In 2009, Myrick received a six percent merit increase in pay and a promotion.

20. Myrick's performance evaluation in 2009 reflected she had once again exceeded expectations.

21. During the 2007-2009 timeframe, Myrick was successfully completing management

training.

22. Myrick received another merit increase in pay in 2010.

23. Myrick was recognized in 2010 by the defendant for her accomplishments in increasing accounts.

24. In 2011, Myrick received a six percent merit increase in pay.

25. In 2011, the defendant recognized Myrick with a Superior Achievement Award.

26. In 2012, Myrick received multiple performance awards from the defendant.

27. In performance evaluations completed in 2013 and 2014, the Vice Presidents who ultimately fired Myrick praised her consistently.

28. For example, when she was evaluated in 2013, Myrick's appraisal noted she had exceeded expectations and she received a superior achievement award.

29. Positive feedback from supervisors Joseph Schuhbauer and Kathleen Zierers on the appraisal signed in 2013 reflected that Myrick was considered talented and creative as a leader and with regard to communications and team-building.

30. Myrick was also characterized in the 2013 appraisal as able to work independently with little guidance during a time when she received a promotion to a new role, which included developing the department she was promoted to manage.

31. Based on the performance appraisal dated April 2013, Myrick received a 4 percent merit increase to her salary.

32. The appraisal dated April 2014 included praise from Kathleen Zierers such as "I greatly appreciate all the new creative initiatives you and your team have implemented."

33. Joe Schuhbauer also praised Myrick in the appraisal dated April 2014 by complimenting

her "initiative," how she took "ownership of her responsibilities," and her "high desire for her team to be successful."

34. Myrick received a Certificate of Appreciation in 2014 as well as a merit increase in pay.

35. Myrick took the lead in many initiatives that improved performance at Navy Federal during the last several years of employment, with measurable differences attributed to her leadership, creativity, tenacity in practical problem-solving, and her success in motivating her team to achieve goals.

36. Myrick was complimented by Vice Presidents in her chain of command for her sound judgment based on "wisdom" "analysis" and "experience."

37. As a manager, she was complimented for clearly communicating goals with measurable results.

38. Myrick was also complimented for her rapport with her team, her honesty, and her willingness to hold herself accountable.

39. Myrick's skills in presenting ideas were also praised, and her recommendations on process improvements consistently accepted and implemented.

40. Regarding Myrick's work patterns, she consistently worked more than forty hours a week as a salaried manager.

41. Her pay was on a salary basis.

42. Myrick's work ethic was such that by the time of her termination, she had accrued 210.88 hours of paid sick leave (SL) and 206.82 hours of annual leave (AL) which were, according to Navy Federal, hours of paid leave she could use.

43. Myrick's work ethic drove her to choose work over family on many occasions, but a

significant health issue arose for a close relative that required Myrick to be away from the office on an intermittent basis in 2015.

44. Because of Myrick's substantial leave balance, which she never expected to use; her tendency to work remotely during days she was not at her desk; and her tendency to work in excess of 8 hours on days she reported to work during the weeks when she might have had to be away from the office temporarily, Myrick tracked her time and deducted from her leave balance only when she did not in good faith believe she had made up the missed time through long hours on other days in the work week.

45. Myrick considered herself accountable to the same rules she set for her team: ideally, work from home should be limited to 8 hours per month, whether that is spread out over time or all on one day, and flex time around appointments when possible.

46. During 2015, Myrick worked remotely more than 8 hours per month.

47. On April 21, 2015, Myrick notified her supervisor, Schuhbauer, that she was at the emergency room with a close family member at 11:46 pm and that the instructions for follow up required her to be absent the following day.

48. Schuhbauer's response, which Myrick did not recall reading, was "no worries, get yourself fixed and ready for next week. Don't forget to update payline with SL."

49. Myrick worked remotely on multiple days, including but not limited to April 7, April 14, May 12, June 4, and June 23.

50. Myrick contacted Cigna, the third party administrator for benefits, in June 2015 for clarification if she was to take leave time when she worked from home.

51. In June 2015, Cigna instructed Myrick not to take leave if she worked from home.

52. When issues occurred at work, and Myrick was not at her desk, she updated her supervisor about the level of engagement she could maintain, and she resolved issues remotely on each occasion.

53. At no time was Myrick counseled, reprimanded, warned, or in any way criticized for her time away from her desk until July 23, 2015.

54. On July 23, 2015, Myrick's supervisor had a meeting with her about performance, which was a positive meeting until Myrick was surprised to hear that her supervisor had a concern about her time away from her desk.

55. Myrick reminded him that there had been issues with her family member's health problems, but that if she had to be away from her desk, she had continued to stay engaged at work through remote communication and telephone calls.

56. During this meeting on July 23, 2015, the supervisor, Joe Schuhbauer, repeatedly said Myrick had to be at her desk to be a leader.

57. Schuhbauer knew at the time he said to Myrick that she had to be at the office to be a leader that she remotely supervised two other branches by design of the business.

58. During this meeting on July 23, 2015, Schuhbauer acknowledged that Myrick was continuing to meet branch goals and objectives in her performance.

59. Schuhbauer stated he was disappointed Myrick had missed a Tech and Ops Town Hall on July 1, which he claimed, three weeks later, impacted negatively on her performance as a leader. Prior to July 23, Myrick had never received any feedback from Schuhbauer about not attending the Town Hall meeting.

60. Schuhbauer also stated there were "discrepancies" on her "time card."

61. Myrick requested more information about what he had seen were discrepancies, but he only stated that she had received an email from him in April about updating her sick leave balance.

62. Myrick, in the spirit of being accountable and thorough, looked back as far as April 2015 based on the conversation she had with her supervisor although she did not know what he meant by "discrepancies."

63. In checking again, Myrick concluded her time sheet was up to date with regard to her SL and AL balances and asked again for more information about dates in particular he questioned.

64. Myrick explained that because of illness of her or a family member, she had worked from home, and that when Schuhbauer had told her nonetheless to take leave, she had recorded 8 hours of sick leave on her payline.

65. At the time Myrick wrote the message on July 24, 2015, she in good faith believed she was being responsive and accurate, but in the stress of the moment, she did have a few typographical errors in her email as a result of the debilitating stress she was experiencing due to a life-threatening condition affecting her close family member.

66. From at least April 21, 2015, Schuhbauer was aware of the nature of the condition affecting the close family member and who that family member was because Myrick had what she thought was an open and candid relationship with her manager.

67. Being apprised of Schuhbauer's concerns, and realizing that what Cigna had told her was not consistent with his view of how she should take leave, Myrick began the process for getting approval for FMLA leave retroactively applied to certain days.

68. On August 10, 2015, Myrick emailed Schuhbauer with an update regarding her communication with Cigna about FMLA approval, and in that communication she shared with him what Cigna advised her: that if she worked from home, she did not claim that time as FMLA leave. She further updated him that per discussion with Cigna, the days being submitted for retroactive approval were April 15, July 2, and July 29.

69. On August 10, 2015, her intermittent leave was conditionally approved subject to certification from the physician.

70. On August 20, 2015, Schuhbauer reviewed with Myrick additional dates considered to be misreported by Myrick.

71. Schuhbauer conducted the meeting in the presence of Vice President Julie Griffin.

72. Navy Federal terminated Myrick's employment on August 26, 2015 with a letter signed by Zierers, who had previously had nothing but praise for Myrick, and with a meeting led by Schuhbauer and attended by Griffin.

73. Ironically, while Schuhbauer and Griffin were informing Myrick that she was fired for stealing time, she was also told by Griffin that there was no need for her to be escorted out of the building, per company policy with terminated employees, because Myrick was "trusted."

74. At the time of the termination, Schuhbauer and Cigna were aware that Myrick could not submit the required certification by August 25, 2015 because the soonest available doctor's appointment from the time the certification was requested did not permit Myrick to comply.

75. Brandon Wiles of Cigna had been contacted about the need for an extension, and he had

assured Myrick the extension was granted up to and including August 30, 2015.

76. Before the termination, Myrick had informed Schuhbauer via email of the status of her extension being granted to submit the required certification.

77. Myrick had followed up twice with Cigna to confirm the extension was granted up to and including August 30, 2015, and she was assured the extension had been entered into Cigna's system as approved.

78. Myrick believed she had been granted an extension by both Cigna and Schuhbauer as of August 25, 2015, the date the certification would have been submitted had she been able to obtain an earlier doctor's appointment.

79. Being terminated for an integrity violation was devastating to Myrick personally and professionally.

80. Meanwhile, her close family member continued to struggle with a life-threatening condition.

81. Myrick was at first unable to secure other employment.

82. When Myrick was able to secure employment, her pay was very significantly reduced.

83. Navy Federal disciplined and decided to terminate Myrick with the knowledge that she had been absent on an intermittent basis because of a serious health condition of a close relative and with knowledge she was seeking approval for those absences as FMLA leave.

84. Navy Federal failed to adequately train its employees in the employer's responsibilities under federal law.

85. Navy Federal improperly delegated its responsibility for compliance to Cigna.

86. Navy Federal failed to maintain FMLA policies and practices in compliance with federal law and regulation.

87. Defendant failed to have effective policies and procedures in place to prevent and correct the wrongs stated herein.

88. Navy Federal failed to act in good faith compliance with federal law.

89. Myrick has had to retain counsel to vindicate her rights.

## COUNT I
## FAMILY AND MEDICAL LEAVE ACT
## INTERFERENCE

90. Myrick adopts and incorporates the allegations set forth above in support of this Count.

91. At all material times, Myrick was an eligible employee under the FMLA.

92. At all material times, Navy Federal was an employer for purposes of the FMLA.

93. Myrick had worked for twelve months and 1,250 hours in the twelve months preceding the acts forming the basis of this claim.

94. Myrick's close family member suffered from a serious health condition, as defined by the FMLA, during employment with Navy Federal.

95. When Myrick attempted to exercise her rights protected under the FMLA, her supervisor precluded her from being able to take leave by terminating her employment.

96. Her supervisor terminated her employment with knowledge of her need for an extension in submitting the certification paperwork, and he did so one day after the original certification deadline.

97. The supervisor was aware that Cigna, the third party administrator for benefits, had granted Myrick an extension to submit her certification paperwork at the time he

terminated Myrick's employment.

98. Before Myrick had any idea she was to be fired, Myrick informed him of her request for an extension as well as of her being granted an extension.

99. Prior to her termination, Myrick had been a highly regarded member of management who consistently received merit increases.

100. Prior to her attempt to take FMLA leave, Myrick had received no disciplinary action.

101. Myrick has lost pay and benefits as a result of the defendant's illegal conduct.

102. The defendant's conduct was knowing and in reckless disregard of the federally-protected rights of Myrick.

103. Navy Federal purposefully interfered with Myrick's efforts to exercise her rights under the FMLA benefits.

104. The failure of the Defendant to comply with the FMLA has injured the plaintiff, and she seeks damages to make her whole from those injuries.

## COUNT II
## FAMILY AND MEDICAL LEAVE ACT
## RETALIATION
## 29 U.S.C. §§ 2614, et seq.

105. Myrick adopts and incorporates the allegations set forth above in support of this Count.

106. At all material times, Myrick was an eligible employee under the FMLA.

107. At all material times, Navy Federal was an employer for purposes of the FMLA.

108. Myrick had worked for twelve months and 1,250 hours in the twelve months preceding the acts forming the basis of this claim.

109. Myrick's close family member suffered from a serious health condition, as defined by the

FMLA, during employment with Navy Federal.

110. Myrick was singled out for unwarranted and inconsistent discipline by her supervisor when he had knowledge of Myrick's efforts to exercise her rights under the FMLA.

111. Myrick, at the time of termination, had taken leave that was eligible for approval pursuant to the FMLA.

112. Decision-makers of the defendant knew of Myrick's time off and why she was absent.

113. Decision-makers in discipline and termination retaliated against her for taking the intermittent leave and seeking FMLA benefits.

114. Prior to her termination, Myrick had been a highly regarded member of management who consistently received merit increases.

115. Prior to her attempt to take FMLA leave, Myrick had received no disciplinary action.

116. Myrick has lost pay and benefits as a result of the defendant's illegal conduct.

117. The defendant's conduct was knowing and in reckless disregard of the federally-protected rights of Myrick.

118. Navy Federal's agent or agents knowingly relied on the illegal application of its policies to conclude that Myrick's employment should be terminated.

119. The retaliation included the punitive and arbitrary disciplinary meetings of July 23, 2015 and August 20, 2015 as well as her termination on August 26, 2015.

120. The series of pretextual disciplinary events that punished Myrick for the pursuit of FMLA benefits were in violation of the retaliation provision of the FMLA.

121. The failure of the Defendant to comply with the FMLA has injured the plaintiff, and she seeks damages to make her whole from those injuries.

WHEREFORE, PREMISES CONSIDERED, Myrick respectfully requests the entry of judgment against the defendant, Navy Federal, for the violations of law set forth herein, pursuant to an Order by which the Court:

    a.    awards back pay;

    b.    awards nominal damages;

    c.    awards damages for loss of benefits;

    d.    awards actual damages;

    e.    awards liquidated damages;

    f.    awards injunctive relief, including but not limited to reinstatement, or in the alternative, front pay;

    g.    awards pre-judgment and post-judgment interest;

    h.    awards that relief which is fair, reasonable and just;

    i.    awards a reasonable attorney's fee; and

    j.    taxes costs against said defendant.

PLAINTIFF REQUESTS A TRIAL BY STRUCK JURY.

*s/Heather Fisher Lindsay*

Heather Fisher Lindsay
Florida Bar Number 073441
**LINDSAY & LINDSAY, P.A.**
5218 Willing Street
Milton, FL  32570
(850) 623-3200
hfl@lal-law.com

Counsel for Plaintiff